| | |
|---|---|
| **DISTRICT COURT, JEFFERSON COUNTY, STATE OF COLORADO**<br>100 Jefferson County Parkway<br>Golden, Colorado 80401 | DATE FILED: July 6, 2020 12:21 PM<br>FILING ID: 3AD29890DFF40<br>CASE NUMBER: 2020CV30783 |
| **CASEY ROBINSON and JEFFCO EDUCATION SUPPORT PROFESSIONALS ASSOCIATION,**<br><br> Plaintiffs,<br><br>v.<br><br>**JEFFERSON COUNTY SCHOOL DISTRICT R-1; JEFFERSON COUNTY SCHOOL DISTRICT R-1 BOARD OF EDUCATION; STEVE BELL, as an individual and in his official capacity as Chief Operations Officer of Jefferson County School District R-1; GREG JACKSON, as an individual and in his official capacity as Executive Director of Transportation for Jefferson County School District R-1; MICHAEL HINZ, as an individual and in his official capacity as Fleet Services Coordinator of Jefferson County School District R-1,**<br><br> Defendants. | <br><br><br><br><br><br><br><br><br><br><br><br><br>▲ COURT USE ONLY ▲ |
| **Attorney for Plaintiffs:**<br>Erik G. Bradberry, #49894<br>Colorado Education Association<br>1500 Grant Street<br>Denver, Colorado  80203<br>Phone:  (303) 837-1500<br>Fax:  (303) 861-2039<br>email: ebradberry@coloradoea.org | Case Number:<br><br>Division: |
| **COMPLAINT AND JURY TRIAL DEMAND** ||

The Plaintiffs, Casey Robinson and the Jeffco Education Support Professionals

Association ("JESPA"), through counsel, hereby submit the following Complaint and Jury Trial

Demand against the Defendants:

1

## I.  NATURE OF THE ACTION

1.   The Plaintiffs bring this action to redress breaches of contract, violations policy, and

infringements of statutory and constitutional rights by the Defendants.  Both Plaintiffs present

this case as a breach of the collective bargaining agreement ("CBA" or "Agreement") between

JESPA and Jefferson County School District R-1 ("School District" or "District"), which

guaranteed certain job protections to covered employees, including Robinson.  Robinson brings

four additional claims under state and federal law: (a) first, for breach of contract for the

Defendants' acts of retaliation against him in violation of School District policy; (b) second, for

discharge in violation of public policy against individual Defendants whose willful and wanton

acts led to the termination of his employment; (c) third, for retaliation in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and (d) fourth, for violation of due

process pursuant to the Fourteenth Amendment of the United States Constitution and 42 U.S.C. §

1983.

## II.  JURISDICTION AND VENUE

2.   The District Court of Jefferson County State of Colorado, has jurisdiction of this action

pursuant to Article VI, Section 9, of the Colorado Constitution.

3.   Venue is proper in this District pursuant to Rule 98 of the Colorado Rules of Civil

Procedure.

## III.  ADMINISTRATIVE PROCESS AND JURISDICTIONAL PREREQUISITES

4.   The School District terminated Robinson's employment on April 19, 2019.  On or about

June 7, 2019, Robinson filed a written notice with the School District pursuant to the Colorado

Governmental Immunity Act ("CGIA"), § 24-10-109, C.R.S.  The notice complied in form and

within the time restrictions set forth in §§ 24-10-109 and 118(1)(a), C.R.S.

5.   JESPA filed a grievance on Robinson's behalf pursuant to the procedures set forth in the CBA.  JESPA alleged, *inter alia*, that Robinson's discharge: (a) was a violation of the CBA because there was no just cause to support the District's decision to terminate his employment; and (b) violated District Policy DIF because it was the culmination of a pattern of retaliation Robinson suffered after reporting asset losses in the Transportation department.

6.   The grievance process began with a Level 1 meeting that included representatives of JESPA, Robinson, and Executive Director of the School District's Transportation department, Greg Jackson.  Jackson issued a written decision after the Level 1 meeting denying the grievance.

7.   JESPA timely appealed to Level 2 of the grievance procedure.  The parties to the grievance presented their cases to Chief Operating Officer Steve Bell.  Bell issued a written decision denying the grievance.

8.   JESPA timely appealed to Level 3 of the grievance procedure.  The parties to the grievance presented their cases to Community Superintendent Tom McMillen.  McMillen issued a written decision denying the grievance.

9.   The School District was represented by counsel at Levels 1, 2, and 3 of the grievance process.

10.   After the School District denied the grievance at Level 3, JESPA issued a timely demand for arbitration.  The parties, now both represented by counsel, selected Katy Miller to serve as the arbitrator.  After a one-day hearing, held on December 19, 2019, Ms. Miller issued an advisory award recommending that (a) the grievance be upheld; (b) the District reinstate Robinson as an employee; and (c) Robinson receive a full award of back wages and benefits from the date of his termination through the date of his reinstatement.

11.   The School District's Board of Education ("Board") took Ms. Miller's award under advisement and then rejected it by a 4-to-1 vote on March 11, 2020.  With that, JESPA and Robinson exhausted their contractual remedies as to the claims raised in the grievance.

12.   On February 4, 2020, Robinson filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

13.   On April 24, 2020, Robinson, through counsel, requested a "right to sue" notice regarding the matters raised in Robinson's Charge of Discrimination.  In response, the U.S. Department of Justice issued the notice on May 12, 2020.

14.   The Plaintiffs have met all contractual and administrative prerequisites to initiating the instant lawsuit.

## IV.   PARTIES

15.   Plaintiff Casey Robinson is a former employee of the School District.  At all times relevant hereto, Robinson has resided in Jefferson County, Colorado.

16.   Plaintiff JESPA is a membership organization comprised of classified, non-management employees of the School District.  At all times relevant hereto, JESPA has been the sole and exclusive bargaining representative of these employees pursuant to the terms of collective bargaining agreements between it and the School District.  JESPA's business office is located in the City of Golden, Jefferson County, Colorado.

17.   The Defendant School District is a Colorado public school district duly constituted and existing pursuant to applicable Colorado laws.  The School District's administrative offices and schools are located in Jefferson County, Colorado.

18.   The Defendant School District's Board of Education is the body, duly constituted and existing pursuant to applicable Colorado law, responsible for the overall management and

operation of the School District.  The Board's administrative office is located in the City of

Golden, Jefferson County, Colorado.

19.   Defendant Steve Bell is, and at all times relevant hereto was, the School District's Chief

Operating Officer.  In that capacity, Bell directs and implements the School District's support

services and manages the operation of a number of School District departments, including its

Transportation department.  Bell's office is located in Jefferson County, Colorado; on

information and belief, Bell resides in Jefferson County, Colorado.

20.   Defendant Greg Jackson is, and at all times relevant hereto was, the Executive Director

of the School District's Transportation department.  In that capacity, Jackson directs and

manages all aspects of the School District's Transportation department, including its Fleet

Services division.  Jackson's office is located in Jefferson County, Colorado; on information and

belief, Jackson resides in the City of Thornton, Adams County, Colorado.

21.   Defendant Mike Hinz is the Fleet Services Coordinator of the School District's

Transportation department.  In that capacity, Hinz, oversees the daily and long-term operation of

the School District's Fleet Services division, administers the maintenance and repair programs of

all School District vehicles, and coordinates the acquisition and disposal of all School District

vehicles.  Hinz' office is located in Jefferson County, Colorado; on information and belief, Hinz

resides in Jefferson County, Colorado.

## V.    FACTUAL ALLEGATIONS

### THE COLLECTIVE BARGAINING AGREEMENT
### & PERTINENT SCHOOL DISTRICT POLICY

22.   The allegations set forth in paragraphs 1 through 21 of this Complaint and Jury Trial

Demand are incorporated herein by reference.

23.   JESPA and the School District negotiated a CBA that was effective from September 1, 2013 through August 31, 2019.  The Agreement applied to a large number of classified employees ("Covered Employees") in various School District departments, including Transportation.  Exh. 1, Art. 1-1.

24.   Under the CBA, the School District and the Board were not one-in-the-same.  The CBA defined "School District" or "District" as the Jefferson County School District, in the State of Colorado.  Exh. 1, Art. 1-2-3.  The term "Board", meanwhile, referred to the Jefferson County School District Board of Education.  *Id.* at 1-2-1.

25.   The CBA constituted official Board policy, and placed "just cause" restrictions on the Board's authority to discharge Covered Employees.  Exh. 1, Art. 2-3; 15-3-1.

26.   The CBA recognized that Covered Employees were entitled to due process whenever the District exercised its authority to discharge employees.  Exh. 1, Art. 8-2.

27.   Covered Employees are third-party beneficiaries of the CBA.

28.   The CBA distinguished between types of Covered Employees.  A "Newly Hired Probationary Employee" was a Covered Employee in his or her first 60 days with the School District.  Exh. 1, Art. 1-5-2.  Newly Hired Probationary Employees were not entitled to "just cause" job protection.  *Id.*

29.   After a Covered Employee's successful 60-day probationary period, he or she attained just cause job protection, which the CBA defined as "a fair and adequate cause, which is based on reasonable grounds and governed by the exercise of good faith."  Exh. 1, Art. 1-5-1; *see also* Art. 15-3-1.

30.   The CBA contained provisions governing corrective action—i.e. employee discipline. As part of the Agreement's overall disciplinary scheme, the parties agreed that corrective action

should be progressive in nature.  To that end, the CBA provided that a first instance of misconduct was to be met with a written reprimand; a second instance of misconduct was to result in an unpaid suspension, demotion, or both; and a third instance of misconduct resulted in termination of employment.  Exh. 1, Art. 15-2-1.

31.  As an exception to the agreed-upon progressive discipline framework, the CBA permitted the School District to terminate a Covered Employee immediately for "intentional violation of District Policy" or upon "conviction of a felony."  Exh. 1, Art. 15-2-2.

32.  The CBA provided that the School District had the right to discipline or discharge employees "for just cause", as defined by the Agreement.  Exh. 1, Art. 15-3-1; *see also* Art. 1-5-1 (defining "just cause") (emphasis added).

33.  The CBA also provided two other ways the District could terminate the employment of a Covered Employee.  Namely, the School District could announce a Reduction in Force ("RIF"), pursuant to Article 11 of the CBA.  Or, the District's Board of Education could "relieve employees from duty for lack of work or other legitimate reasons[.]"  Exh. 1, Art. 11; Art. 2-9.

34.  Management employees of the School District, including Defendants Bell, Jackson, and Hinz were aware of the job protections afforded to Covered Employees by virtue of the CBA.  For example, Defendants Bell and Jackson both have served as hearing officers in grievances pursuant to the CBA, where both were tasked with understanding and applying the "just cause" and other provisions.  Hinz understood himself to be an "at-will" employee because, unlike JESPA bargaining unit members, he had no "just cause" or other form of contractual job protection.

35.  Unlike the CBA, District policies adopted by the Board of Education apply to all School District employees.

7

36.   In September 2013, the Board adopted Policy DIF, which remained in effect at all times relevant here.  Policy DIF stated the Board's expectation that all Board members, employees, volunteers and others "act with integrity, due diligence and in accordance with law in their duties involving the [D]istrict's resources."  Exh. 2.  Through Policy DIF, the Board expressed the importance of maintaining public trust as it relates to the taxpayer funds with which the District was entrusted.  *Id.*

37.   Policy DIF prohibited anyone subject to its provisions from engaging in fraud, or any other financial irregularity or impropriety.  Exh. 2.  The policy also provided:

> Any [D]istrict employee who suspects fraud, impropriety, or irregularity in relation to [D]istrict assets or resources <u>shall</u> report their suspicions immediately to their supervisor, [D]istrict audit staff, Employee Relations office, Security and Emergency Management office or the "SAFE TO TELL" hotline[.] Employees who bring forth a legitimate concern or suspicions about a potential impropriety <u>shall not be retaliated against</u>.

*Id.* (emphasis added).

## ROBINSON'S EMPLOYMENT WITH THE SCHOOL DISTRICT AND REPORTS OF MISSING INVENTORY

38.   At all times relevant here, the School District's Transportation department employed approximately 480 employees.  The Transportation department maintained four terminals, situated throughout the School District's expansive boundaries.

39.   Fleet Services is a division within the Transportation department.  The Fleet Services division consisted of approximately 45 employees.  Among other functions, Fleet Services supplied the four Transportation terminals with parts they needed to maintain the School District's large fleet of buses and other vehicles.

40.   The School District hired Robinson on or about March 29, 2017 to work in the Fleet Services division of the Transportation department.  Robinson's job was officially designated

"Lead Parts & Warranty – Fleet Maintenance".  Robinson and others routinely referred to his job as the Parts Controller.  Following successful completion of his probationary period, Robinson became a Covered Employee under the CBA.

41.   Robinson was responsible for managing Fleet Services' warehouse operations, which included purchasing, receiving, and stocking parts; negotiating prices for parts; writing bid specifications; and overseeing vehicle and parts warranties.   Robinson's duties also included overseeing inventory control; analyzing parts usage; and ensuring fiscally responsible procurement and other business practices.

42.   In Fleet Services' organizational hierarchy, Robinson supervised one employee—the Parts Delivery Driver.  Robinson reported to Fleet Services Manager Paul Kusner, who reported to Executive Director of Transportation Greg Jackson.  Jackson, in turn, reported to Chief Operating Officer Steve Bell.

43.    Robinson, along with most—if not all—other employees in the Fleet Services division, was paid according to a wage scale set by his job grade and years of experience.  Robinson's job, Parts Controller, was set at grade R-23.

44.   At all times relevant here, the Parts Delivery Driver, Robinson's only direct report, was Patrick Garcia.  Garcia's duties included picking up and delivering parts; assisting with all aspects of the parts room; and performing light mechanical duties.  As Parts Delivery Driver, Garcia's job was graded much lower than Robinson's—i.e. at level R-12.

45.   When Robinson started working for the School District, the parts room, which stored inventory valued at approximately $500,000 at any given time, was highly disorganized.  Parts were difficult to locate; drivers, mechanics, and even vendors entered the room at their leisure; and tracking inventory proved to be nearly impossible.

46.   Robinson quickly set about addressing these concerns.  For example, he reorganized the parts room and implemented a system for tracking incoming and outgoing inventory.

47.   Robinson became concerned about possible theft or mismanagement of District assets in September 2017.  On September 25, 2017, pursuant to Policy DIF and common sense, Robinson emailed Paul Kusner, Greg Jackson, and all shop foremen in the four Transportation terminals to alert them that five fleet-tracking devices ("Zonars") were missing from a cabinet in his office. Nobody responded to Robinson's email, the District made no effort to investigate the whereabouts of the Zonars, and the devices were never located.

48.   During a routine inventory count less than one month later, Robinson noticed eight "Houdini" vests were missing.[1]   Robinson again emailed his supervisors, Kusner and Jackson, along with at least ten other Transportation department employees to notify them of the missing inventory.  Neither Kusner nor Jackson replied to the email.  A single terminal director did, but only to wish Robinson good luck locating the missing vests because, according to the terminal director, they were worth "a lot of money!"  The School District did not investigate Robinson's report of the missing vests, and the vests were never located.

49.   With inventory going missing and his reports failing to inspire so much as an inquiry by the District, Robinson asked that locks be installed on the doors to the parts room.  By restricting access to the room, Robinson reasoned, he could curb future inventory losses or, at a minimum, make any losses easier to investigate.

50.   In or about November 2017, the School District fulfilled Robinson's request and installed new locks on the doors to the parts room.  The change was met with frustration and

---

[1] "Houdini" vests are devices, akin to a harness, used to secure students with special needs while they are on a school bus.

negative feedback from a number of Transportation department employees.  The most resistance

came from the foreman of the North Terminal, George Frey, and the Parts Driver, Patrick Garcia.

51.   Frey, for example, complained that things were more efficient when he could simply

enter the parts room and take what he needed for his shop.  As his frustration mounted, Frey

accused Robinson of deliberately failing to order parts for the North Terminal, allegedly

hindering his ability to keep his fleet of vehicles operational.  Robinson, who kept detailed

records of the orders he placed and filled, discredited Frey's assertions, which added to Frey's

frustration and fueled his hostility toward Robinson.

52.    Garcia became increasingly difficult for Robinson to supervise and manage.  He, too,

falsely accused Robinson of failing to order parts for Frey and the North Terminal.  He also

refused to help with projects, such as stocking inventory, and he steadfastly resisted suggestions

on how to become more efficient in the use of his time while making parts deliveries.

53.   In January 2018, Robinson approached Kusner and Jackson to share the troubles he was

having with Frey and Garcia.  Neither Kusner nor Jackson investigated the concerns Robinson

raised, nor did either offer assistance to ease the building tensions between Frey/Garcia and

Robinson.

54.   In March 2018, Robinson met with Kusner and Garcia to discuss the problems inherent

in a subordinate (Garcia) who refuses to take direction from his supervisor (Robinson).  Kusner's

solution was as puzzling as it was unfeasible—i.e. he told Robinson to stop trying to manage

Garcia, and instead to funnel all his requests of Garcia through him (Kusner).

55.   In April 2018, before leaving for a vacation, Robinson received into inventory a fuel

injector pump.  It was an expensive piece of inventory, valued at approximately $2,650.  When

Robinson returned from vacation, the pump was missing and there was no indication on the inventory tracking system that pointed to who took it or where it went.

56.   Robinson reported the missing pump to Kusner and Jackson, and asked for a meeting to discuss the issue.

57.   Robinson met with Jackson to discuss the missing pump on May 3, 2018.  During the meeting, Robinson shared his concerns about the missing pump, and also reiterated his concerns about the missing Zonars and Houdini vests.  Jackson asked Robinson who he thought might have taken the missing injector pump.  Robinson responded that it might have been Frey, reasoning that his terminal had one of the few vehicles in the District compatible with and in need of that part.

58.   Also on May 3, 2018, Robinson provided a written statement detailing when he ordered the injector pump, when it was delivered, and who had access to the parts room while he was on vacation.  Robinson attached invoices and other documents to his report, including inventory log sheets and delivery sheets.

59.   On May 8, 2018, Jackson issued his findings concerning the missing injector pump. Jackson agreed the pump was missing, but concluded it had likely been installed on a District vehicle, but with "no record of the transaction."  Strangely, Jackson also concluded Robinson's "allegation" that Frey took the missing pump was "slanderous" and that there was "no evidence to support his claim."  Jackson supported his assertion of "slander" by criticizing what he characterized as Robinson's timeline of events, which he claimed differed from Garcia's timeline—i.e. Jackson considered Garcia's timeline more credible than Robinson's.

## ROBINSON'S REPORT OF RACE DISCRIMINATION
## AND OTHER PROTECTED ACTIVITY

60.    Robinson, who is African American, felt a concerted animosity toward him, evidenced by the actions and attitudes of Garcia, Frey, Kusner, and Jackson, among others.  Garcia, for example, continued to refuse to be managed by Robinson, and Kusner compounded the problem by refusing to allow Robinson to take any steps to correct Garcia's insubordination.  Robinson found himself excluded from meetings that others—who were not African American—were invited to attend.  Robinson began to suspect his race was the factor causing his co-workers and supervisors to treat him differently.

61.    On July 29, 2018, pursuant to the School District's internal complaint procedure, Robinson submitted a written complaint of discrimination and hostile work environment based on race.  In his complaint, Robinson alleged Frey, Garcia, and Kusner committed acts of bullying, harassment, and discrimination against him, and that his race was a factor that motivated those acts.

62.    Employee Relations staff attorney Kristyn Myers received Robinson's complaint and assigned a District investigator, Dean Warkentin, to look into it.

63.    Warkentin interviewed Robinson and other employees in the Fleet Services division, including Kusner, Garcia, and Frey.  As word spread in Fleet Services and elsewhere in the District about Warkentin's investigation—and, by extension, about Robinson's complaint of race-based discrimination and harassment—the conflict and harassment that led to Robinson's complaint in the first place intensified.  For example, soon after Robinson submitted his report of discrimination, Garcia's complaints about Robinson increased in frequency, ranging from the fairly mundane—e.g., accusing Robinson of not letting him know the passcode for the office voicemail system—to the much more serious—e.g., claiming Robinson was causing low morale

and a hostile environment in the Fleet Services division.  In an email to Kusner, Jackson, and Robinson on or about August 5, 2018, Garcia summarized a meeting he had with Kusner a few days earlier.  As part of his summary, Garcia described how he and Kusner discussed that Robinson's actions were harming morale and that he should be held accountable.

64.   A few weeks later, Kusner changed Robinson's work hours.  With the change, Robinson was to report to work a full three-and-a-half hours after Garcia.  This meant a great deal of idle time for Garcia and greater difficulty for Robinson, who found himself tasked with managing an unsupervised employee who refused to take his direction and was actively trying to convince department managers that he, Robinson, was the source of all that ailed Fleet Services.

65.   On November 8, 2018, the District issued its findings based on Warkentin's investigation.  The District concluded, in pertinent part, that the evidence Warkentin gathered did not support there having been a violation of the District's anti-discrimination/harassment policies, but that one or more unnamed staff members had failed to meet the District's expectations, and that corrective action for that/those employee(s) was forthcoming.

66.   The next day, November 9, 2018, Fleet Services Manager Kusner issued to Robinson a disciplinary letter of reprimand based on events that had allegedly occurred months earlier.  In the letter, Kusner accused Robinson of being unprofessional, aggressive, and hostile toward Frey in a meeting nine months earlier.  Kusner further claimed Robinson had been similarly aggressive and hostile toward Frey, Garcia, and another Fleet Services employee, Mike Hinz, during a meeting in October 2018.  Kusner's accusations of Robinson as angry, aggressive, and hostile were both (a) false; and (b) crude, belittling stereotypes of Robinson as an "angry Black man."

14

67.   Ironically, in his letter of reprimand, Kusner admonished Robinson to refrain from using racial, discriminatory, or abusive language, and directed Robinson to meet with a counselor from the District's Employee Assistance Program ("EAP") to work through what he characterized as Robinson's "issues."

68.   Robinson disputed, and continues to dispute, the assertions and characterizations contained in Kusner's letter of reprimand.

69.   Several months later, on February 20, 2019, Robinson and many others in the Transportation department received an email from a mechanic, announcing his resignation from the District.  Prior to his resignation, the mechanic worked in the North Terminal, under Frey's supervision.  In his email, the mechanic described feeling harassed and discriminated against by Frey based on his national origin—the mechanic was a native of Ukraine.  Robinson forwarded the email to Chief Operating Officer Bell, Staff Attorney Myers, and his JESPA representative, Sharleen Farmer.  In his forward, Robinson stated that he, too, had endured verbal harassment and unequal treatment by Frey, and expressed hope that the District's culture might change to be more inclusive of a diverse workforce.  Bell replied to Robinson's email.  In his reply, Bell requested a meeting and demanded that Robinson be able to make out a case to support the statements contained in his email.

70.   When the meeting Bell requested took place, Bell did not mention the email exchange or ask Robinson why he was able to empathize with the outgoing mechanic.  Instead, Bell insisted during the meeting that Robinson had a "problem," and tried to persuade Robinson to resign from the School District.  In the alternative, Bell advised, if Robinson opted not to resign, it would be incumbent upon him to "make friends" with Garcia, Frey, Kusner, and everyone else in Fleet Services in order to curtail the discrimination and hostility he was experiencing.

### THE SCHOOL DISTRICT'S "RESTRUCTURE"
### OF THE TRANSPORTATION DEPARTMENT

71.   Shortly after the School District completed its investigation into Robinson's complaint of discrimination and harassment, Executive Director of Transportation Jackson contacted a management consultant named Matthew VanAuken.  Ostensibly, Jackson enlisted VanAuken's help to address communication problems and complaints, including those brought forward by Robinson, prevalent throughout the Fleet Services division.

72.   On December 10, 2018, the District and VanAuken entered into a services agreement, according to which the District retained VanAuken to:

a.      Discuss with Transportation department leadership current and future work expectations within the department;

b.      Create clearly defined and specific job descriptions and duties for the Transportation department supervisors;

c.      Provide coaching to help resolve workplace conflict; and

d.      Provide leadership coaching to a number of managers in the Fleet Services division.

73.   The services agreement further provided that the objective of VanAuken's work was to assist Fleet Services in developing clear goals and expectations of the supervisors in that division; connect with all terminal leadership; help resolve communication conflicts; and improve key work deliverables.  The services agreement also stated that Executive Director Jackson would direct VanAuken's work with the District.

74.   The services agreement did <u>not</u> reflect that VanAuken was tasked with making recommendations regarding the structure of the Transportation department, nor of the Fleet Services division, nor concerning the elimination of any positions.  The services agreement also

16

did not reflect that VanAuken's work was aimed at achieving cost efficiencies or to address a lack of work in the division.

75.   VanAuken visited worksites in the Fleet Services division and met with employees, including Robinson.  When VanAuken met with Robinson, the two discussed the conflict between Robinson and Garcia; Robinson showed VanAuken the shop he oversaw, and explained the changes he had made during his time with the District.

76.   On January 7, 2019, Transportation department managers, including Chief Operating Officer Bell and Executive Director Jackson, summoned Fleet Services employees to a meeting at District headquarters.  In addition to Bell and Jackson, those in attendance at the meeting included Kusner, Hinz, Garcia, Robinson, and VanAuken.

77.   Bell began the meeting by explaining there would be some changes made to the Transportation department.  With that, Bell turned the meeting over to Jackson and VanAuken, who were to elaborate on Bell's announcement.  Jackson reported that he and VanAuken had decided to "restructure" the Fleet Services division by giving several jobs different titles and rates of pay, eliminating some jobs, and creating other ones.

78.   Garcia asked whether that meant some employees in the room might lose their jobs— i.e. see their employment terminated.  In response, Jackson made room for the possibility that some <u>management</u> employees—those not covered by the CBA—could find themselves in that position.  However, he was quick to point out that the CBA did not allow Covered Employees to lose their employment under the circumstances he was describing; rather, he assured Garcia and everyone else, if a Covered Employee lost the position they held at the time, they would be placed into a comparable position with no resulting loss of salary or benefits.  In effect, they

would be transferred to another position.  Indeed, Jackson announced the District would actively help anyone in need of a different position to find one.

79.   There was no mention during the January 7, 2019 meeting of budget issues, cost savings, or lack of work.

80.   On February 25, 2019, VanAuken submitted a report to Jackson setting forth his executive summary of the "position replacement process and recommendation for the Fleet Services Coordinator position."  The Fleet Services Coordinator position VanAuken was referring to was the new iteration of the Fleet Services Manager position, which until that time had been held by Kusner.  Fleet Services Coordinator, like Fleet Services Manager, was to be a management position—i.e. not part of the JESPA bargaining unit.  VanAuken's report is silent regarding the positions held at the time by Robinson and Garcia.

81.   Mike Hinz and Paul Kusner competed for the Fleet Services Coordinator position.  Hinz received the position, and Kusner, an at-will employee, left the District.

82.   Robinson continued working as the Parts Controller and Garcia as the Parts Delivery Driver until Jackson and perhaps other District administrators "eliminated" those positions in favor of a new one, which they called "Technician, Parts & Warranty – Fleet Maintenance."  The District informed Robinson and Garcia their current positions were being eliminated and advised that both could apply for the retooled Parts Controller position.

83.   In reality, Jackson did not "eliminate" Robinson's position.  The "new" position was identical in nearly every material way to the Parts Controller position Robinson had held for approximately two years.  The only noteworthy differences were:

        a.   The new position would no longer supervise a delivery driver;

    b.   A few duties formerly performed by the delivery driver—e.g., pick-up and

        delivery of parts—were incorporated into the new position; and

    c.   The wage grade increased from R-23 to R-24.

84.   Both Robinson and Garcia applied for the retooled Parts Controller position.

85.   Jackson delegated to Hinz, the newly appointed Fleet Services Coordinator, responsibility for convening an interview panel to screen the two applicants—Robinson and Garcia—and render a recommendation concerning who should receive the "new" position. Jackson retained approval authority over the panel Hinz selected, and instructed Hinz he expected the panel to include individuals who would be working with the person selected for the "new" position.

86.   Hinz selected the following individuals to serve on the interview panel:

    a.   Deanna Cable (Fleet Operations Supervisor);

    b.   Barb Ruley (Purchasing Agent);

    c.   Jeff McAlister (Outside Vendor); and

    d.   George Frey (North Terminal Foreman).

87.   Hinz submitted his list to Jackson, who did not strike any of the above-named individuals. Jackson added one more member, Wally Maistryk, a JESPA member, to the panel. The panel thus consisted of Hinz, Cable, Ruley, McAlister, Frey, and Maistryk.

88.   Both Hinz and Jackson knew of the documented conflict and tension that existed between Frey and Robinson, including Robinson's complaint that Frey was a perpetrator of the race discrimination and harassment he had reported to the District on numerous occasions. Indeed, Jackson himself had accused Robinson of "slandering" Frey in connection with his report of the missing injector pump.

89.   Hinz' decision, which Jackson approved, to include Frey on the interview panel compromised the objectivity of the panel.

90.   Hinz and Jackson compounded the potential for bias with the inclusion of Deanna Cable.  When he selected Cable, Hinz knew that her son had recently been hired to work as a mechanic in the North Terminal—under Frey's supervision.

91.   Adding yet another layer of irregularity to the composition of the interview panel, Hinz selected, and Jackson approved, Jeff McAlister to serve.  McAlister was not employed by the School District; rather, he was a commission-based salesperson who sold auto parts to the Transportation department.  It was highly unusual to include a non-employee on a School District job interview panel, particularly where he had a financial interest in maintaining a business relationship with Hinz and other members of the panel, including Purchasing Agent Ruley.  That interest made McAlister more inclined to adopt views expressed by the majority of the panel—especially Hinz, the management employee on the panel—than to form and express his own, purely objective opinions.

92.   Amid all the actual and potential bias on the interview panel constructed by Hinz and Jackson, the President of JESPA, Lara Center, declined to serve on the panel because both Robinson and Garcia were members of the JESPA bargaining unit, and JESPA had been involved in helping Robinson through some of the above-described difficulties he encountered in the workplace.  Center reasoned that her participation on the panel might create an appearance of bias in favor of Robinson; thus, she declined the invitation to serve.[2]

93.   The interviews took place on or about April 12, 2019.  Before he arrived, Maistryk did not know who, besides him, would be on the interview panel.  When he arrived and saw Frey,

---

[2] Maistryk took Center's place as the JESPA representative on the panel.

Maistryk was surprised because he knew about the conflict, bullying, and harassment surrounding Frey's and Robinson's interactions.  Indeed, Maistryk understood that to be common knowledge in the Fleet Services division.

94.   Before the interviews started, Jackson and Hinz met with the interview panel to explain how the process would unfold.  Each member of the panel would take turns reading a question from a list generated by Hinz; once a question was read, the interviewee would answer it; the panel members would score the answer on a scale from 1 to 5, with 5 being the most points possible for a given answer; and when the interview was complete and the interviewee excused, the panel would compare and compile their scores.  Hinz specifically instructed panel members to stick to their "script"—i.e. the list of questions he compiled.

95.   Neither Jackson nor Hinz, nor anyone else, provided any training to the panel members to ensure consistency among their expectations and ratings.

96.   During the interviews, Frey made a comment to the panel members that struck Maistryk as indicating bias against Robinson.  Maistryk reminded Frey and the other panel members they were supposed to be objective.

97.   Four members of the panel—Hinz, Cable, Ruley, and Frey—were not objective, as evidenced by the scores they assigned Garcia and Robinson.  Specifically, these panel members, representing a majority, consistently rated Garcia—who had never held the Parts Controller job that was functionally identical to the job for which he and Robinson were competing— significantly higher than Robinson, who had been performing successfully as the Parts Controller for two years.

98.   The panel majority thus selected Garcia for the "new" position, which Jackson approved.  With that, Robinson would be in the position Garcia contemplated when he asked

whether anyone might lose their jobs as part of the "restructure" Bell, Jackson, Hinz, and

VanAuken discussed with Fleet Services employees on January 7, 2019.

99.   On April 19, 2019, Jackson informed Robinson that he had not been selected for the

"new" position and that, consequently, Jackson was relieving him of his duties, effective

immediately.  Jackson instructed Robinson to hand in his keys, identification card, laptop, and all

other District property in his possession.  Jackson informed Robinson he would receive pay

through May 1, 2019, and that his benefits would cease at the end of that month.  With that,

Jackson wished Robinson well in his future endeavors and encouraged him to apply for

vacancies in the District for which he was qualified.

100.      In short, Jackson informed Robinson on April 19, 2019 that the District was

discharging him.  However, while Jackson generally explained that Robinson had not been

selected for the "new" position, he gave no reason why that meant Robinson's employment was

to be terminated.  Jackson also failed to give Robinson an opportunity to respond to the District's

decision to terminate his employment—i.e. to confront and discuss that decision—before the

decision was made, and at a time where a different outcome might have been achieved.

Moreover, Jackson failed to inform Robinson he could appeal the decision to terminate his

employment through the CBA's grievance process.

## GRIEVANCE AND ARBITRATION

101.      As described in Section III of this Complaint and Jury Demand, *supra*, JESPA

filed a timely grievance challenging Robinson's termination.  JESPA alleged, *inter alia*, that

Robinson's termination violated the anti-retaliation provision of Policy DIF, as well as the "just

cause" and other provisions of the CBA.

102.        On May 8, 2019, the parties to the grievance convened a Level 1 meeting.  In

attendance were JESPA's Executive Director Vicki Flores, Robinson, Jackson, and District Staff

Attorney Katherine Jensen.  On May 17, 2019—less than a month after terminating Robinson's

employment—Jackson issued his Level 1 decision.  Jackson advanced the position that Policy

DIF was not subject to the grievance process.  Then—in puzzling fashion—he stated the "just

cause" challenge was untimely because JESPA should have calculated its filing deadline

beginning January 7, 2019—i.e. the date of the meeting where Bell, Jackson, and Hinz informed

the gathered employees some of them <u>might</u> lose their current positions, but <u>not</u> their

employment status if they were in the JESPA bargaining unit.  In addition, Jackson repeated that

Robinson had not been selected for the "new" position, but failed to explain why the District

terminated Robinson's employment rather than transferring him in another position for which he

was qualified.  Jackson assumed he was justified in upholding Robinson's termination as part of

what he called an "organization-wide restructure."

103.        In fact, and as Jackson knew, there had been no "organization-wide restructure."

The School District is a large organization with thousands of employees.  The Transportation

department alone had approximately 480 employees, about 45 of whom worked in Fleet

Services.  The structure of the School District and the Transportation department remained

unchanged.

104.        Jackson and Bell had decided to "restructure" the Fleet Services division and

"eliminate" certain positions, most notably, Fleet Services Manager (formerly held by Kusner)

and Parts Driver (formerly held by Garcia).  Pertinent here, Jackson and Bell did not "eliminate"

Robinson's position (Parts Controller)—they simply added a few duties to it in doing away with

the Parts Driver position, as Jackson knew when he authored the Level 1 grievance decision.

105.       JESPA appealed Jackson's decision to Level 2 of the grievance process.  On June 6, 2019, the parties to the grievance convened a Level 2 meeting.  In attendance were Robinson, Flores, Center, Jensen, and—as the Level 2 decision-maker, Chief Operations Officer Bell.  On June 14, 2019, Bell issued his decision.  In his decision, Bell explained it had been he and Jackson who decided the Fleet Services division needed to be "restructured".  Then, in denying the grievance, Bell asserted the position that Robinson's employment had not been terminated; rather, his position had simply been eliminated as part of a "restructure" of the Fleet Services division.  However, as Bell knew, Robinson's position had not been "eliminated"; in fact, he and Jackson merely added several of the Parts Driver responsibilities to Robinson's position, Parts Controller.

106.       JESPA appealed Bell's decision to Level 3 of the grievance process.  On August 15, 2019, the parties to the grievance held a Level 3 hearing, where School District Community Superintendent Tom McMillen acted as the hearing officer.  McMillen, like Bell, concluded Robinson's employment had not been terminated.  According to McMillen, Robinson had been "laid off" based on the elimination of his position.  Thus, without addressing the substance of JESPA's claims, including that Robinson's termination was a violation of the "just cause" requirements contained in the CBA, McMillen denied the grievance.

107.       JESPA appealed McMillen's decision to Level 4 of the grievance process—advisory arbitration.  During the December 19, 2019 arbitration hearing, the District conceded Robinson had not been laid off pursuant to Article 11 of the CBA, as McMillen asserted at Level 3.

108.     On January 23, 2020, Arbitrator Katy Miller issued an award recommending, *inter alia*, that JESPA's grievance be upheld, and that Robinson be reinstated as a School District employee with a full award of back pay.

109.     On March 11, 2020, the District's Board issued a resolution rejecting Arbitrator Miller's recommendation.  Before announcing its decision, the Board considered Arbitrator Miller's recommendation in executive session.  On information and belief, the Board was accompanied by its attorney, who had participated in the grievance, including during the arbitration hearing and briefing that followed.  Robinson's attorney was not present, nor given the opportunity to be present, during the Board's executive session.

110.     In rejecting Arbitrator Miller's recommendation, the Board—for the first time at any point in the grievance process—claimed the authority to terminate Robinson's employment resided in the CBA's "management rights" provision.  The Board stated the management rights provision gave the District authority to discharge employees for "legitimate reasons."  Exh. 3, Board Resolution; *see also* Exh. 1, Art. 2-9.

111.     The management rights provision cited by the Board does not give the District authority to discharge employees for "legitimate reasons"; it states that authority is retained by the Board.  Exh. 1, Art. 2-9.

112.     In order for the District to possess authority retained by the Board, it follows the Board must have delegated that authority to the District.  Whereas the Board acts through its elected officials, the District acts primarily through its administrators and other employees, including Bell, Jackson, and Hinz.

113.     The Board delegated to District administrators, including Bell and Jackson, the authority to establish final employment policy, such as restructuring the Fleet Services

department and discharging classified employees, including Robinson, for "legitimate reasons."

Consequently, Bell and Jackson's decision to restructure Fleet Services and terminate

Robinson's employment represent official Board policy.

## VI.   LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (Both Plaintiffs against All Defendants)

114.     The allegations set forth in paragraphs 1 through 113 of this Complaint and Jury

Trial Demand are hereby incorporated by reference.

115.     The CBA is a binding contract, enforceable by the parties and Covered

Employees, as third-party beneficiaries.

116.     The Defendants terminated Robinson's employment without just cause.

117.     The Defendants terminated Robinson's employment without affording him

contractual due process.

118.     The Defendants did not terminate Robinson's employment pursuant to the

Board's retained management rights, and neither Bell nor Jackson were motivated by achieving

cost savings or other efficiencies when they discharged Robinson.

119.     The Defendants had no legitimate reason for terminating Robinson's employment.

120.     The Defendants' extra-contractual termination of Robinson's employment caused

Robinson to suffer damages, including loss of employment, loss of employment opportunities,

lost wages, lost benefits, and lost retirement contributions.

121.     The Defendants' extra-contractual termination of Robinson's employment caused

JESPA to suffer damages, including, but not limited to, loss of Robinson's JESPA membership

dues.

**SECOND CLAIM FOR RELIEF**
**Breach of Contract**
**(Plaintiff Robinson against All Defendants)**

122.　　The allegations set forth in paragraphs 1 through 121 of this Complaint and Jury

Trial Demand are hereby incorporated by reference.

123.　　The Board of Education adopted, and at all times relevant here maintained, Policy

DIF.

124.　　Policy DIF limits the Defendants' authority to discharge employees by prohibiting

retaliation against employees who make reports of suspected fraud, theft, or other financial

improprieties.

125.　　Robinson fulfilled his obligations under Policy DIF by, for example, reporting

loss of assets, including Zonar systems, "Houdini" vests, and an injector pump.

126.　　The Defendants retaliated against Robinson because of his compliance with

Policy DIF.　For example, Jackson accused Robinson of "slandering" Frey when Robinson

responded truthfully to a question Jackson posed during his investigation into Robinson's report

of a missing injector pump.　In addition, Jackson was motivated to curb Robinson's complaints

when he and Bell "restructured" the Fleet Services division.　Jackson and Bell undertook the

"restructure" with an outcome in mind—i.e. the termination of Robinson's employment.

127.　　Robinson suffered damages as a result of the Defendants' breach of Policy DIF,

including loss of employment, loss of employment opportunities, lost wages, lost benefits, and

lost retirement contributions.

**THIRD CLAIM FOR RELIEF**
**Wrongful Discharge in Violation of Public Policy**
**(Plaintiff Robinson against Defendants Bell, Jackson, and Hinz)**

128.     The allegations set forth in paragraphs 1 through 127 of this Complaint and Jury Trial Demand are hereby incorporated by reference.

129.     During the course of his employment, Robinson reported suspected loss, theft, or other financial improprieties pursuant to Policy DIF because it was his duty as a citizen and employee to do so.

130.     Defendants Bell, Jackson, and Hinz were aware, or reasonably should have been aware, that Policy DIF imposed on Robinson and all other employees the duty to report suspected loss, theft, or other financial improprieties relating to District funds or assets.

131.     The Board, in fact or in effect, delegated to Bell and Jackson the authority to discharge classified employees, including Robinson.

132.     Jackson delegated to Hinz responsibility for conducting the job interviews that were instrumental in Robinson's discharge.  In that capacity, Hinz selected—and Jackson approved—a biased interview panel that included Frey, who had been a central figure in Robinson's report of the missing or stolen injector pump.  When he selected Frey, Hinz knew of the conflict between Robinson and Frey.

133.     Defendants Bell and Jackson, with assistance from Hinz, discharged Robinson in the course of their duties as School District employees and because he followed the reporting obligation imposed on him by Policy DIF.

134.     Bell and Jackson's decision to terminate Robinson's employment was a willful and wanton act.  Bell and Jackson intentionally disregarded Robinson's rights under District

policy and the CBA without any legal justification or excuse and without regard to the consequences Robinson would suffer, including loss of employment and income.  For example, Bell, Jackson, and Hinz all knew Robinson was a Covered Employee under the CBA who could not be discharged except in accordance with that Agreement, as evidenced by Jackson's acknowledgment on January 7, 2019 that no Covered Employees would be discharged in connection with the purported Fleet Services "restructure."  Bell, Jackson, and Hinz stripped Robinson of his position, duties, salary, benefits, District identification, District property, access to District technology, and all other trappings of employment, then implausibly insisted his employment had not been terminated.  Rather, they argued, his position had been "eliminated."

135.    Robinson suffered damages as a result of Bell, Jackson, and Hinz' willful and wanton conduct, including loss of employment, loss of employment opportunities, lost wages, lost benefits, lost retirement contributions, physical injury, emotional distress, shame, humiliation, and loss of enjoyment of life.

136.    Robinson has satisfied all jurisdictional prerequisites set forth by the CGIA, §§ 24-10-109 and 118.

**FOURTH CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.***
**(Plaintiff Robinson against All Defendants)**

137.    The allegations set forth in paragraphs 1 through 136 of this Complaint and Jury Trial Demand are hereby incorporated by reference.

138.    Robinson engaged in protected opposition to discrimination when he filed a report with the School District alleging race discrimination.  Robinson also engaged in protected opposition to discrimination when he supported a mechanic who reported harassment based on national origin.

139.     The Defendants subjected Robinson to a series of adverse actions that would dissuade a reasonable employee from engaging in protected activity.  For example:

a.     The day after the School District completed its investigation into Robinson's report of race discrimination, the District issued Robinson a letter of reprimand premised on disputed assertions that allegedly occurred many months before.

b.     Immediately after Robinson supported another employee's report of national origin harassment, Defendant Bell scheduled a meeting with Robinson where he demanded Robinson be able to "make a case" to support claims of discrimination and harassment.

c.     During the ensuing meeting between Bell and Robinson, Bell tried to persuade Robinson to resign from the School District.

d.     Less than two months after Robinson supported another employee's claim of national origin harassment, the Defendants terminated Robinson's employment.

140.     There is a causal connection between Robinson's protected activities and the adverse consequences he suffered, as evidenced by, for example, the temporal proximity between the activities and the consequences, as set forth above.

141.     Robinson suffered damages as a result of the Defendants' acts of retaliation, including loss of employment, loss of employment opportunities, lost wages, lost benefits, lost retirement contributions, physical injury, emotional distress, shame, humiliation, and loss of enjoyment of life.

142.     Robinson has satisfied all administrative prerequisites to asserting the instant claim for relief.

**FIFTH CLAIM FOR RELIEF**
**Deprivation of Due Process in Violation of U.S. Const. amend. XIV, § 1**
**(Plaintiff Robinson against All Defendants)**

143.      The allegations set forth in paragraphs 1 through 142 of this Complaint and Jury

Trial Demand are hereby incorporated by reference.

144.      Each Defendant constitutes a "person" within the meaning of that term as used in

42 U.S.C. § 1983.

145.      At all times relevant to this case, each Defendant acted "under color of state law"

within the meaning of that term as used in 42 U.S.C. § 1983.

146.      The Defendant Board of Education delegated to administrative employees,

including Chief Operating Officer Bell and Executive Director of Transportation Jackson the

authority to establish final employment policy in the form of discharging classified employees

for what they considered "legitimate reasons."

147.      Defendants Bell, Jackson, and Hinz violated clearly established rights when they

deprived Robinson of his protected property interest in continued employment without affording

him notice, an opportunity to be heard, and a pre-deprivation hearing.

148.      Even if a post-termination grievance process where Robinson bore the burden of

proof were adequate process, Defendants Bell and Jackson violated Robinson's clearly

established right to a neutral decision-maker when they acted as the grievance hearing officers at

Levels 1 and 2.

149.      The Board of Education deprived Robinson of due process when it went into

executive session, accompanied by its attorneys, who represented the District during the

adversarial arbitration proceeding under consideration, without affording Robinson the

opportunity to be present.

31

150.     The Defendants' actions violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## VII.   RELIEF REQUESTED

**WHEREFORE**, the Plaintiffs respectfully request the Court to enter judgment in their favor and against the Defendants, and award them all relief as allowed by law and equity, including, but not limited to, the following:

a.      Actual economic damages, in amounts to be determined at trial;

b.      Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

c.      Punitive damages against individual Defendants or as permitted by law;

d.      Attorney fees and costs of this action, including expert witness fees, as appropriate;

e.      Appropriate equitable relief, including but not limited to declaratory and injunctive remedies including an order reinstating Robinson's employment with the School District; and

f.      Such other and further relief as justice requires or the law permits.

**PLAINTFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 6th day of July 2020.

Respectfully submitted,


/s/ Erik G. Bradberry
Erik G. Bradberry, #49894
Colorado Education Association
1500 Grant Street
Denver, CO 80203
(303) 837-1500
ebradberry@coloradoea.org

**Plaintiffs' Addresses:**

Casey Robinson
2055 Miller Street
Lakewood, CO 80215

Jeffco Education Support Professionals Association
910 Loveland Street
Golden, CO 80401