IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-2442-RBJ

CASEY ROBINSON and
JEFFCO EDUCATION SUPPORT PROFESSIONALS ASSOCIATION,

      Plaintiffs,

v.

JEFFERSON COUNTY SCHOOL DISTRICT R-1,
JEFERSON COUNTY SCHOOL DISTRICT R-1 BOARD OF EDUCATION,
STEVE BELL, an individual,
GREG JACKSON, in his individual and official capacity as Executive Director of
Transportation for Jefferson County School District R-1, and
MICHAEL HINZ, in his individual and official capacity as Fleet Services Coordinator of
Jefferson County School District R-1,

      Defendants.

---

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Casey Robinson worked for the Jefferson County School District ("the District"). His employment was terminated as part of what the District calls a departmental restructure. Mr. Robinson and his bargaining union, the Jeffco Education Support Professionals Association ("JESPA"), argue that the so-called restructure was pretextual, and that Mr. Robinson was fired in retaliation for his complaining about harassment and financial improprieties. Mr. Robinson and JESPA (collectively, "plaintiffs") sued the District, the Jefferson County School District Board of Education ("Board of Education") and District employees Steve Bell, Greg Jackson, and Michael Hinz (collectively, "defendants") alleging violations of the Collective Bargaining Agreement ("CBA"), illegal retaliatory termination, and

deprivation of constitutional due process rights.  After discovery, defendants requested summary judgment on all claims under Fed. R. Civ. P. 56 (ECF No. 28).  For the following reasons, that motion is DENIED IN PART and GRANTED IN PART.

## I.   FACTS

### A.  Background

Mr. Robinson began working for the District's transportation department in March 2017. ECF No. 29 at 2–3.  The department employs about 400 workers, mostly bus drivers.  ECF No. 29-4 at 4–5.  Mr. Robinson worked in the division of the transportation department called "Fleet Services."  *See* ECF No. 29-3.  His job as the Parts Controller, formally called "Lead Parts & Warranty – Fleet Maintenance," involved managing parts inventory for the District's fleet of school buses and other vehicles.  *Id.*  His salary grade was R-23.  *Id.*  Mr. Robinson's employment ended on April 19, 2019.  ECF No. 29-27.

Mr. Robinson, like most transportation department employees, was a member of a bargaining unit represented by JESPA.  ECF No. 29-7 at 3.  JESPA negotiated the terms and conditions of its members' employment with the District and memorialized those terms in the CBA.  ECF No. 29-8.  The CBA empowered the District to terminate the employment of bargaining unit members in only three scenarios: First, the District could terminate employees "for just cause."  *Id.* at 46 (Art. 15-3-1).  Second, employees could be terminated as part of a "Reduction in Force."  *Id.* at 34–35 (Art. 11).  Finally, the general "Management Rights" defined in the CBA permitted the Board of Education "to terminate or otherwise relieve employees from duty for lack of work or other legitimate reasons."  *Id.* at 12 (Art. 2-9).  Defendants claim that Mr. Robinson's employment was terminated for "other legitimate reasons."  *See* ECF No. 28 at 18.

During most of Mr. Robinson's tenure, Paul Kusner managed the Fleet Services division. ECF No. 29-4 at 7. Defendant Mike Hinz took over management of the Fleet Services Division in January 2019 under the new title of "Fleet Services Coordinator." *See* ECF No. 28 at 5–6. Just above Messrs. Kusner/Hinz in the chain-of-command was Executive Director Greg Jackson, also a defendant. ECF No. 29-4 at 3. Mr. Jackson reported to Chief Operations Officer Steve Bell, another defendant, who in turn reported to the superintendent. ECF No. 29-6 at 3, 5. Messrs. Bell, Jackson, and Kusner/Hinz were at-will employees not covered by the CBA. ECF No. 29-6 at 9.

One employee in Fleet Services—Patrick Garcia, the parts delivery driver—reported directly to Mr. Robinson. ECF No. 29-2 at 9. Mr. Garcia's salary grade was R-12. ECF No. 29-5. Another employee with whom Mr. Robinson worked was a shop foreman named George Frey. Mr. Robinson and Mr. Frey communicated daily over the phone until "the conflict," an incident in February 2018 where Mr. Robinson verbally attacked Mr. Frey. ECF No. 29-13 at 11. After that, they communicated by email. *Id.* at 14.

### B. Conflicts

Mr. Robinson's time in Fleet Services was not exactly smooth. The parties describe turmoil sparked by reports of missing inventory, interpersonal conflicts, and claims of discrimination and harassment.

The Board of Education had adopted a policy, Policy DIF, requiring any employee who suspected "fraud, impropriety or irregularity in relation to district assets or resources" to "report their suspicions immediately." ECF No. 28-4 at 1–2. Policy DIF said that employees who reported "legitimate concern[s] or suspicions . . . shall not be retaliated against." *Id.* at 2. The Policy also provided for investigations into reported concerns.

In fall 2017, Mr. Robinson twice reported inventory missing from the parts room pursuant to Policy DIF.  *See* ECF No. 29-11; ECF No. 29-10.  In both cases he sent an email to Mr. Kusner and Mr. Jackson and copied other transportation department employees notifying them of the missing inventory, requesting help locating the items, and directing everyone to log what they take out of the parts room.  *See id.*  Mr. Robinson noticed that one of the shops, the one overseen by George Frey, was "using an exorbitant amount of parts compared to all three of the other shops."  ECF No. 29-2 at 5.  Mr. Robinson found this "alarming" and reported it to his supervisors.  *Id.*  The supervisors ignored these reports.  *See id.*

In February 2018 a heated incident occurred between Mr. Robinson and Mr. Frey.  At a meeting attended by Messrs. Robinson, Frey, Kusner, and four other shop foremen, Mr. Robinson "stood over top of [Mr. Frey] and was screaming and yelling," accusing Mr. Frey of not reporting missing parts and failing to do his job.  ECF No. 29-13 at 11–13.  Mr. Frey testified that Mr. Robinson's conduct shocked the other foremen, who intervened to calm Mr. Robinson. *Id.* at 13.  Mr. Frey further testified that the incident was "a bad memory" that he "kind of blocked out of [his] memory."  *Id.*  After the incident, Mr. Frey "did not feel safe" communicating with Mr. Robinson in person or via phone, so they communicated exclusively by email. *Id.* at 17.

A few months later, Mr. Robinson reported an expensive injector pump missing.  ECF No. 29-14.  This time, Mr. Jackson and Mr. Kushner quickly scheduled a meeting to discuss it. *See* ECF No. 28-3 at 5.  Mr. Jackson testified that, at the meeting, Mr. Robinson accused Mr. Frey of taking the part.  *Id.* at 6.  Mr. Robinson said he never accused Mr. Frey of stealing the pump, ECF No. 29-2 at 10, but he did mention Mr. Frey as a possible suspect because a coworker had reported Mr. Frey in the parts room around the time the pump went missing, *see*

ECF No. 29-15 at 2.  In any case, Mr. Jackson opened an investigation into the missing injector

pump in which he interviewed Mr. Frey.  *See* ECF No. 28-3 at 9–10.  Mr. Jackson informed Mr.

Frey that he stood accused of stealing the injector pump but, according to Mr. Jackson, he never

told Mr. Frey who had accused him.  *Id.* at 11.  Mr. Jackson could not find the pump, but his

final report concluded that it had been placed on a District school bus without being recorded.

ECF No 29-16.  The report also admonished Mr. Robinson for a "slanderous" allegation against

Mr. Frey.  *Id.* at 2.

Mr. Robinson's relationships with Mr. Frey and others continued to deteriorate.  In July

2018, Mr. Robinson filed a formal written complaint with the District claiming race

discrimination and identifying Frey as a vindictive, intimidating bully.  ECF No. 29-17.  He also

claimed that Mr. Garcia, the parts driver who was supposed to report to Mr. Robinson, was

"hostile, combative," and "repeatedly circumvented" Mr. Robinson's authority by going directly

to Mr. Kusner.  *Id.*  After the complaint was filed, Mr. Kusner changed Mr. Garcia's work

schedule to minimize overlap with Mr. Robinson.  ECF No. 29-2 at 8.  Mr. Robinson found this

unacceptable—he reported to Mr. Bell, the C.O.O., that the new schedule disabled him from

performing his job functions, was done in retaliation for his complaints, and exemplified the

discrimination and hostile work environment he was experiencing.  *Id.* at 8–9.

On November 8, 2018 the District informed Mr. Robinson that it had completed its

investigation into his discrimination claim.  ECF No. 28-7.  Mr. Robinson was informed that the

evidence "[did] not support a conclusion that district policies were violated," but that "one or

more staff members did not meet [the District's] expectations," so it would "recommend[]

remedial action."  *Id.*  The notification letter identified neither which staff member(s) fell short

of the District's expectations nor who had been interviewed as part of the investigation.  *See id.*

The very next day, Mr. Kusner issued Mr. Robinson a disciplinary letter of reprimand. ECF No. 28-2. The letter admonished Mr. Robinson for "unprofessional, aggressive, and hostile" behavior in an October 23rd meeting called to discuss the shift changes Mr. Robinson found unacceptable. *Id.* The letter reprimanded Mr. Robinson for "inappropriate[ly]" dismissing Mr. Garcia from the meeting and showing a "lack of respect for the process." *Id.* In a section titled "Prior Action(s)," the letter of reprimand noted that Mr. Robinson had been given a "verbal warning" in February 2018 for his "aggressive and hostile behavior" towards Mr. Frey. *Id.* The letter also directed Mr. Robinson to meet with a counselor from the District's Employee Assistance Program to "work through some of your [Mr. Robinson's] issues." *Id.*

### C. Termination

Around the same time, fall 2018, Mr. Jackson engaged an outside consultant named Matthew VanAuken to analyze Fleet Services. *See* ECF No. 29-20 at 2–3. The parties dispute the purpose for which Mr. VanAuken was hired. Plaintiffs contend that Mr. VanAuken was hired to connect with leadership, resolve conflicts, and improve deliverables by, among other things, helping to create clearly defined job descriptions. ECF No. 29 at 7. Plaintiffs note that Mr. VanAuken was nowhere directed or empowered to recommend organizational restructuring, elimination of positions, or ways to reduce costs.[1] *Id.* Defendants contend that Mr. VanAuken had been given "broad" authority to make appropriate recommendations. ECF No. 28 at 4.

In any case, Mr. VanAuken recommended restructuring Fleet Services. ECF No. 28-9. Messrs. Jackson, Bell, and VanAuken held a meeting announcing the restructure at which they said that four positions would be consolidated into three, leaving one "odd man out." ECF No. 29-21 at 8–9. Mr. Jackson said that if the person who lost his or her job was a JESPA bargaining

---

[1] An outside arbiter agreed with plaintiffs' characterization of Mr. VanAucken's job description. *See* ECF No. 29-1 at 8.

member, management would do what it could to help him or her find a different job in the District.  ECF No. 29-4 at 9–10.  It is unclear whether employees were told at that meeting that Mr. Robinson's position would be impacted or eliminated in the restructure.[2]

Three things happened in quick succession after the meeting, but the exact timing of these events is not clear.  First, Mr. Hinz and Mr. Kushner interviewed for a newly created management position.  ECF No. 11 ¶ 81.  Mr. Hinz won the position, and Mr. Kusner's employment was terminated.  *Id.*  Seeing that Mr. Kusner was the "odd man out," Mr. Robinson believed his employment with the District to be safe.  ECF No. 29-12 at ¶8.

Second, Mr. Robinson engaged Mr. Bell in a discussion about an outgoing employee who had experienced discrimination and harassment.  The discussion began when a Ukrainian immigrant circulated an email explaining that he was quitting his job because of "verbal harassment [and] discrimination" from Mr. Frey, his shop foreman, and the District's failure to remedy the situation.  ECF No. 29-22 at 4–5.  Mr. Robinson forwarded the email to Mr. Bell with a note that he too had experiences harassment and discrimination by Mr. Frey and the workplace "culture need[ed] to change."  *Id.* at 2.  Mr. Bell responded to schedule a meeting and express his expectation that "there is a case to be made" in support of Mr. Robinson's discrimination claims.  *Id.* at 1.  Mr. Bell opened the meeting by telling Mr. Robinson that he, Mr. Robinson, was the problem.  ECF No. 29-2 at 11–12.  Mr. Bell went on to say that, if Mr. Robinson was unhappy, he should just quit.  *Id.* at 12.  Otherwise, the best way for Mr. Robinson to get along was to be befriend Mr. Frey.  *Id.*

---

[2]An arbitrator found that VanAuken's report was "silent regarding the positions held by Robinson and Garcia" and "ma[de] no mention of a department restructure at all."  ECF No. 29-1 at 10.  The parties do not cite directly to the report, so I cannot consider it.  However, to the extent I can consider the arbitrator's factual findings, I find this description of VanAucken's report to be a factual claim that I must accept at this stage but whose validity must ultimately be determined by the jury.

Third, the District combined Mr. Robinson's position, Parts Controller, and Mr. Garcia's position, parts delivery driver, into a new position called "Technician, Parts & Warranty – Fleet Maintenance." The responsibilities, experience, knowledge, and skills required for the new position were substantially identical to those for Robinson's parts controller position.[3] *Compare* ECF No. 29-23 *with* 29-3. The pay for the new position was one step higher than for Robinson's parts controller position and twelve steps higher than for Garcia's driver position. *See* ECF Nos. 29-3; 29-5; 29-23. The only substantive difference were some additional driving duties replacing the duty of supervising a separate driver. *Id.* On or about March 22, 2018, the District posted the "new" position and invited interested candidates to apply. ECF No. 29-24.

Mr. Robinson and Mr. Garcia both applied and interviewed for the position. Mr. Hinz selected a hiring committee. ECF No. 29-4 at 12. In the interviews, the committee members asked each candidate a list of pre-approved questions and assigned them a score of 1-5 for each answer. ECF No. 28-10 at 15–17. The committee members then tallied up their scores and made a hiring recommendation. *See* ECF No. 28-13 at 5–6.

Plaintiffs question the inclusion of two members of the hiring committee: Mr. Frey, the subject of Mr. Robinson's harassment complaints, and Ms. Deanna Cable, whose son had just been hired by Mr. Frey. *See* ECF No. 11 at ¶¶88–90. Mr. Jackson, who oversaw and approved Mr. Heinz's selection of the hiring committee, knew of Mr. Robinson's conflict with Mr. Frey— Mr. Jackson had reprimanded Mr. Robinson for "slander[ing]" Mr. Frey. Mr. Jackson testified that, upon learning of Mr. Heinz's decision to include Mr. Frey on the committee, the two of them called Mr. Frey to get assurances that he could be unbiased. ECF No. 29-4 at 13. Mr. Frey claimed to have received no such call from Mr. Jackson but recalls promising Mr. Heinz he

---

[3]An arbitrator found that the new position was "largely the same position" as the one held at the time by Mr. Robinson. ECF No. 29-1 at 10.

could remain unbiased despite the conflict.  ECF No. 29-13 at 20–21.  Mr. Heinz, puzzlingly, first denied and then admitted to knowing about the conflict between Mr. Robinson and Mr. Frey.  *See* ECF No. 29-21 at 4.

Most of the panel assigned Mr. Garcia higher overall scores than Mr. Robinson.  *See* ECF No. 29-26.  The scores, however, varied greatly.  One member rated Robinson much higher, another rated Mr. Garcia slightly higher, and the other three, including Mr. Frey and Ms. Cable, rated Mr. Garcia far higher than Mr. Robinson.  *See id.*  The committee recommended Mr. Garcia be hired.  Mr. Jackson informed Mr. Robinson that he did not win the position and instructed him to hand over his identification, keys, laptop, and phone.  *See* ECF No. 29-27.  The termination letter thanked Mr. Robinson for his service and "encourage[d] [him] to apply for any Jeffco vacancies for which [he was] qualified and interested in."  *Id.*  The District provided no additional assistance in helping Mr. Robinson find other employment, and Mr. Robinson did not affirmatively reach out to request a new job.

### D. <u>Appeal</u>

Mr. Robinson and JESPA contested his termination, alleging violation of the CBA and retaliation for reporting discrimination and suspected theft.  ECF No. 11 at ¶5.  He went through the entire complaint process outlined in the CBA.  *See id.* at ¶¶5–12.  At step one, Mr. Jackson rejected the grievance.  *Id.* at ¶6.  At step two, Mr. Bell did the same.  *Id.* at ¶7.  At step three, Superintendent Tom McMillen denied the grievance as well.  *Id.* at ¶8.

Step four was an advisory arbitration proceeding in which both sides were represented by counsel.  *Id.* at ¶10.  The arbitrator found that Mr. Robinson had been terminated in violation of the CBA, and that the District's "restructure" was "pretext for wrongful retaliation against Robinson for his protected activity."  ECF No. 29-1 at 20.  She recommended that (a) the grievance be upheld; (b) the District reinstate Robinson as an employee; and (c) Robinson

receive a full award of back wages and benefits from the date of his termination through the date of his reinstatement. *Id.* The Board of Education considered the arbitrator's report in a private session accompanied by its attorney, who had also represented the District during the adversarial arbitration process. The Board of Education rejected the arbitrator's decision, finding that the interview committee did not act in a retaliatory manner, and that Mr. Robinson had been discharged for "other legitimate reasons," as permitted by the CBA. ECF No. 28-19; *see also* ECF No. 29-8 at 12 (Art. 2-9).

## II.    STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs.*, Inc., 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl*., 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart*

*Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in her favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "[T]he facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

## III.   ANALYSIS

On paper, Mr. Robinson's employment ended when his position was eliminated, and he was not hired for a new position with the District. Defendants suggest there is nothing more to the story. Plaintiffs disagree—they claim Mr. Robinson was fired in retaliation for his reporting discrimination and financial impropriety. Failing to hire Mr. Robinson for a newly created position, argue plaintiffs, was cover for the vindictive scheme. Because plaintiffs base their claims on a theory of pretext and retaliation, I will first assess the evidence supporting plaintiffs' story. At the summary judgment stage, I must accept plaintiffs' version of events unless their allegations are mere "conjecture, speculation, or subjective belief." *Bones*, 366 F.3d at 875. I will then analyze the viability of each individual claim.

### A.   **Plaintiffs' Version of Events**

Plaintiffs paint a three-part picture: (1) termination; (2) pretext; and (3) wrongful motive. First, they claim, Mr. Robinson was terminated by the District. Second, the District's stated

reasons for the process precipitating Mr. Robinson's termination—restructuring Fleet Services, eliminating his position, and declining to hire him for the replacement position—were not defendants' real motivations.  Finally, defendants' actual reasons for firing Mr. Robinson were improper.  I find plaintiffs' account plausibly supported by the record.

Defendants contest each part of plaintiffs' story.[4]  First, they argue that Mr. Robinson was not terminated but instead left the District when he "failed or refused to apply for any [other] position."  ECF No. 34 at 2.  I disagree.  The record shows that Mr. Robinson's job was eliminated, and the District declined to hire him for the near-identical job it invented.  The letter notifying Mr. Robinson of the hiring committee's decision opened by informing him that he was "laid off from [his] position effective immediately," and it concluded with "wishes for success in [his] future endeavors."  ECF No. 29-27.  It directed him to forfeit his identification, keys, and

---

[4] Defendants object to plaintiffs' citing the arbitration opinion created during Mr. Robinson's appeal under the CBA.  Defendants argue that evidence relied upon to avoid summary judgment must be admissible at trial.  I agree.  *See Adler*, 144 F.3d at 671.  Defendants contend that the arbitration opinion "is hearsay and inadmissible," and therefore improper for this Court to consider at summary judgment.  ECF No. 34 at 1.  I understand them to be arguing that advisory arbitration opinions are *per se* inadmissible.  They cite two authorities for this proposition, neither of which support their claim.

In *McAlester v. United Airlines, Inc.*, 851 F.2d 1249 (10th Cir. 1988), the Tenth Circuit held that a district court did not abuse its discretion by refusing to admit an arbitration report.  *Id.* at 1259.  The Tenth Circuit's finding that "admission of an arbitrator's decision is discretionary, not mandatory," *id.* at 1259 n.7, does not require this Court to find the arbitrator's opinion here inadmissible.  Defendant's other case, *Costa v. Desert Palace, Inc.*, 299 F.3d 838 (9th Cir. 2002), is much the same.  *Id.* at 863 ("Other courts have held that district courts have discretion to exclude arbitration awards.").

The district court in *McAlester* excluded the arbitrator's opinion for being more prejudicial than probative under Fed. R. Civ. P. 403.  *See* 851 F.2d at 1259.  If Defendants here move to exclude some or all of the arbitrator's opinion under Rule 403, this Court will have to weigh the decision's probative value against the prejudice it may cause defendants.  Until such a motion is made, I will not ignore the arbitrator's decision.

However, my opinion here would be unchanged even if I did not consider the arbitrator's opinion.  I do not blindly accept her factual descriptions or substantive conclusions—I look to depositions, declarations, and documents in the record.  The arbitrator's opinion is not an authority but merely one example of the conclusions that might be drawn from the factual record.  The Board of Education's decision to reject her opinion exemplifies different conclusions that might be drawn from the record.  Both illuminate the issues, but neither directs my decision.

other District property within three days.  *Id.* at 2.  It thanked him for his "contributions to the District."  *Id.*  Defendants hang their hat on a single sentence "encourag[ing Mr. Robinson] to apply for any Jeffco vacancies for which [he was] qualified and interested in."  *Id.*  Despite this boilerplate language, the letter walks, talks, and acts like a termination letter.  A reasonable jury could find as much.

Second, defendants contest plaintiffs' claim that the District's proffered reasons for firing Mr. Robinson were designed to conceal its true motives: discrimination and/or retaliation. Defendants say that Mr. Robinson's employment ended because he was the odd man out when the transportation department was restructured.  Plaintiffs claim the department "restructure" was pretextual.  I find plaintiffs' claim plausible—the record is replete with evidence that something inappropriate motivated the District's decision to fire Mr. Robinson.  In so finding, I bear in mind that plaintiffs can almost never point to a smoking gun proving pretext.  Instead, "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

A rational jury could find that the restructure was pretextual.  To start, it is unclear whether the department was restructured at all.  The record shows that only minor changes were made to Fleet Services.  Two jobs were eliminated, only one of which—Mr. Robinson's job— enjoyed protections under the CBA.  Moreover, there is evidence that Mr. Jackson and Mr. Bell initially told Fleet Services employees that only a single position would be eliminated, and Mr. Kusner's job was first on the chopping block.  *See* ECF No. 29-21 at 8–9; ECF No. 28-3 at 20. Even if these minor personnel changes are properly called a "restructure," a jury might question

whether Mr. Robinson's position was eliminated at all. The "new" position, titled "Technician, Parts & Warranty – Fleet Maintenance" instead of "Lead Parts & Warranty – Fleet Maintenance," was substantially identical to Mr. Robinson's job. *Compare* ECF No. 29-23 *with* 29-3. The duties and responsibilities outlined in the job description are identical except that the duty to deliver parts replaced a duty to supervise a parts delivery driver (and, in some places, the word "coordinate" replaced the word "manage"). *Id.* The salary is one step higher than Mr. Robinson's original job and twelve steps higher than Mr. Garcia's parts driver job. *See* ECF No. 29-23; 29-3; 29-5. A jury could find that the major difference between the old job and the new one was that Mr. Robinson could not be fired from the former, but he could be excluded from the latter.

Even if a jury were to find that a legitimate restructure eliminated Mr. Robinson's position, it might still question defendants' motives in initiating the restructure. Defendants claim that they were innocently following the recommendation of an outside consultant in restructuring the department. ECF No. 28 at ¶¶17–18. Indeed, the consultant's declaration confirms that he recommended merging Mr. Robinson's Parts Controller position with another in the parts room. ECF No. 28-9 at ¶¶7–8. A reasonable jury might, however, latch on to other facts supporting an inference of pretext. Mr. Jackson testified during arbitration that he sought a consultant because of the number of complaints he had been receiving from Fleet Services. ECF No. 29-1 at 15. The consultant's contract with the District confirms this purpose. ECF No. 29-20 (directing the consultant to "help resolve conflicts on teams"). The contract did not, however request recommendations about personnel changes. *See id.* The contractor may not have believed he was asked to issue such recommendations—when he met with Fleet Services employees, he did not mention the possibility of a restructure. ECF No. 29-21 at 7; 29-12 at ¶5.

His written recommendation did not suggest eliminating Mr. Robinson's position or restructuring the department, according to the arbitration report. ECF No. 29-1 at 10. Yet defendants are adamant that the restructure and ultimate firing of Mr. Robinson were done pursuant to the consultant's recommendation. It would be suspicious if, as plaintiffs' witnesses allege, defendants hired a consultant to resolve "conflicts," and that consultant functionally gave them cover to fire Mr. Robinson and thus "resolve" the conflicts of which he was a part. A jury might credit plaintiffs' witnesses alleging as much.

Plaintiffs' strongest evidence of pretext centers on allegations of bias in the interview process. A reasonable jury could find the interview committee's composition unfairly disadvantaged Mr. Robinson. Mr. Robinson had a history of conflict with Mr. Frey, one of the interview committee members. Mr. Robinson had formally and informally complained that Mr. Frey harassed him and discriminated against him, and possibly accused Mr. Frey of theft. *See* ECF No. 29-17; 29-22. Nonetheless, Mr. Frey helped decide Mr. Robinson's employment status, as did an individual whose son worked for Mr. Frey. *See* ECF No. 11 at ¶¶88–90. Plaintiffs point to evidence indicating that all defendants knew about Mr. Frey's conflict with Mr. Robinson but nonetheless approved Mr. Frey's inclusion on the panel. *See* ECF No. 29-22 at 1; 29-16; 29-21 at 4. Defendants respond that Mr. Hinz, who directly selected the committee, did not know of Mr. Robinson's formal complaints. Knowledge of a formal complaint is not, however, required for knowledge of personal animosity. Mr. Heinz admitted that he knew something of the conflict between Mr. Robinson and one of the individuals Mr. Heinz empowered to decide whether to terminate Mr. Robinson. *See* ECF No. 29-21 at 4.

A jury might further find that the committee membership affected the outcome. Some of the interview questions seem subjective, the members varied widely in their assessments of the

two candidates with the allegedly biased committee members all ranking Mr. Garcia above Mr. Robinson, and the committee found Mr. Robinson less qualified for a job he had been performing for years.  *See* ECF No. 29-26.  It is possible that Mr. Robinson simply gave a poor interview or did not take the process as seriously as he should have, but such a conclusion is not the only rational one that can be reached on this record.

A rational jury might find "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendants' decision to restructure the department, their justifications for the restructure, and the way in which the restructure was carried out.  *Morgan*, 108 F.3d at 1323. Because a jury could "rationally find" defendants' explanations "unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons," *id.*, I find plaintiffs' allegation of pretext sufficiently supported by the record at the summary judgment stage.

Plaintiff also presents some affirmative evidence of discriminatory and/or retaliatory motive.  Some of the defendants expressed displeasure with Mr. Robinson's reporting discrimination and possible financial improprieties.  When Mr. Robinson's formal discrimination and harassment complaint was resolved, his supervisor immediately issued him a letter of reprimand accusing Mr. Robinson of, *inter alia*, discrimination and harassment.  ECF No. 28-2. When Mr. Robinson told defendant Mr. Bell that he had been the victim of discrimination, Mr. Bell reacted defensively, accused Mr. Robinson of being the problem, and advised him to go along to get along.  *See* ECF No. 29-22 at 1; 29-2 at 11–12.  When Mr. Robinson reported an expensive piece of equipment missing, defendant Mr. Jackson called Mr. Robinson's allegation against Mr. Frey "slanderous," ECF No. 29-19 at 2, despite Mr. Robinson's claim that he merely reported missing inventory and never pointed the finger at Mr. Frey, ECF No. 29-2 at 10.  A jury

might find these anecdotes indicative of a culture that reacts to discrimination and theft reports by directing anger towards the one who reports.  Considered in conjunction with evidence of pretext, a jury might find defendants acted upon an improper motive to terminate Mr. Robinson's employment.

### B.   <u>Claim I — Breach of Contract (Breaching the CBA)</u>

I now turn to whether the facts set forth by plaintiffs would entitle them to legal relief. *See Adler*, 144 F.3d at 671.

Plaintiffs' first claim asserts that the District and Board of Education breached the CBA when it fired Mr. Robinson.  ECF No. 11 ¶¶ 114–21.  To recover on a breach-of-contract claim, a plaintiff must show (1) the existence of a contract; (2) the plaintiff's performance; (3) the defendant's failure to perform; and (4) resulting damages to the plaintiff (causation).  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992); *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1033 (10th Cir. 2018).  The parties dispute only whether defendants failed to perform.

The CBA's "Management Rights" provision permits the Board of Education "to terminate or otherwise relieve employees from duty for lack of work or other legitimate reasons."  ECF No. 29-8 at 12 (Art. 2-9).  Defendants argue that the Board of Education and its designees permissibly terminated Mr. Robinson's employment pursuant to this provision.  ECF No. 28 at 18.  Eliminating Mr. Robinson's position and declining to hire him for a new position, argue defendants, constitute "legitimate reasons" for termination.

Defendants are not entitled to summary judgment on this claim.  Plaintiffs contend—and the record plausibly supports a finding—that the restructure was pretextual cover for a retaliatory

firing.  If plaintiffs are correct, Mr. Robinson was not fired for a "legitimate reason."  Whether the restructure was decent or duplicitous is a disputed material fact.

### C.  Claim II—Breach of Contract (Breaching Policy DIF)

Plaintiffs' second claim alleges that the District and Board of Education breached Policy DIF when it fired Mr. Robinson in retaliation for reporting financial improprieties.  ECF No. 11 at ¶¶ 122–27.  Again, this claim requires (1) a contract; (2) plaintiff's performance; (3) defendant's breach; and (4) causal damages.  *W. Distrib. Co.*, 841 P.2d at 1058.

I find that Policy DIF's anti-retaliation provision is enforceable.[5]  Under Colorado law, an employer's statement or policy will be binding if either discloses "a promissory intent" or could be reasonably interpreted as "a commitment by the employer."  *Soderlun v. Pub. Serv. Co. of Colorado*, 944 P.2d 616, 620 (Colo. App. 1997).  Mere descriptions of current practices do not suffice.  *Id.*  Policy DIF required any employee who suspected "fraud, impropriety or irregularity in relation to district assets or resources" to "report their suspicions immediately."  ECF No. 28-4 at 1–2.  Policy DIF said that employees who reported "legitimate concern[s] or suspicions . . . shall not be retaliated against."  *Id.* at 2.  I find that the policy's guarantee that employees who report "shall not be retaliated against" manifests a commitment by the employer.

Defendants next argue that they did not breach the policy because they did not retaliate against Mr. Robinson.  ECF No. 28 at 19–20.  Defendants can make that argument to the jury.  At the summary judgment stage, plaintiffs have presented enough evidence for a reasonable jury to find retaliation and therefore a breach of Policy DIF.

---

[5] Defendants argue that Policy DIF did not create a binding promise to investigate.  ECF No. 28 at 19.  I do not address this argument because plaintiffs' second claim alleges defendants breached Policy DIF by retaliating, not by failing to investigate.  *See* ECF No. 11 at ¶¶ 122–27.

### D.  **Claim III—Wrongful Discharge**

Plaintiffs' third claim alleges that defendants Bell, Jackson, and Hinz wrongfully

discharged Mr. Robinson in retaliation for reporting suspected theft pursuant to Policy DIF.  ECF

No. 11 at ¶¶ 128–36.  Defendants claim immunity from suit under the Colorado Governmental

Immunity Act (CGIA), which extends the state's sovereign immunity to public employees

subject to certain exceptions.  *See Martinez v. Est. of Bleck*, 379 P.3d 315, 322 (Colo. 2016).

Because all parties agree that defendants are public employees under the CGIA, plaintiffs may

only recover if defendants' conduct was "willful and wanton."  C.R.S. § 24-10-118(2)(a).  In the

CGIA context, the Colorado Supreme Court has found informative a case defining "willful and

wanton" as "wholly disregardful of the rights, feelings and safety of others . . . at times even

imply[ing] an element of evil."  *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994) (quoting

*Pettingell v. Moede*, 271 P.2d 1038, 1042 (Colo. 1954)) (alteration in original).  Whether an

individual's conduct was willful and wanton is generally a factual question.  *See Furlong v.

Gardner*, 956 P.2d 545, 551 (Colo. 1998).

Plaintiffs plausibly claim that Mr. Bell, Mr. Jackson, and Mr. Hinz conspired to eliminate

Mr. Robinson's position and rig the hiring process against him.  Intentionally distorting the

hiring process to circumvent Mr. Robinson's for-cause job protections and punish him for

reporting suspected theft would be "willful and wanton."  Because a jury could so find,

defendant's motion is denied.

### E.  **Claim IV—Title VII Retaliation**

Plaintiffs claim that defendants violated Title VII, 42 U.S.C. §§ 2000e, *et seq*., by

retaliating against Mr. Robinson for reporting discrimination and harassment, ECF No. 11 at ¶¶

137–42.  Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973), a plaintiff bears the initial burden of establishing a prima facia case of retaliation, *id.*

at 802–04.  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge and then finally back to the plaintiff to show that the stated reason is pretextual.  *Id.*  To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.  *Argo v. Blue Cross & Blue Shield of Kansas*, Inc., 452 F.3d 1193, 1202 (10th Cir. 2006).

Defendants argue that plaintiffs have not shown a causal connection between Mr. Robinson's reporting discrimination and his being fired.[6]  When assessing causation at the summary judgment stage, the Tenth Circuit permits special latitude to plaintiffs alleging pretextual termination.  If the gap between protected activity and the adverse employment action is less than three months, a plaintiff's showing of pretext is independently sufficient to show causation and withstand a motion for summary judgment.  *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995) ("[A] showing of pretext *is* evidence which allows a jury to infer discriminatory intent.").  If the gap is three months or greater, a plaintiff must present some other affirmative evidence of causation.  *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) ("[W]here a gap of three months or longer has occurred, a plaintiff must present other evidence . . . to establish that her protected activity was a but-for cause of the adverse employment action.").

---

[6] Defendants also argue that the consultant and most of the interview committee did not know about Mr. Robinson's reporting discrimination and therefore could not have retaliated against him for making the report.  This argument misunderstands plaintiffs' claim—the retaliation was done by Mr. Bell, Mr., Jackson, and Mr. Hinz, who approved and designed the restructure and all of whom knew about Mr. Robinson's discrimination report.

Here, Mr. Robinson reported discrimination to Mr. Bell only two months before he was terminated.  ECF No. 29-22; 29-27.  Because this gap is less than three months, plaintiffs need only show pretext to establish a prima facia case of retaliation and survive a motion for summary judgment.  *Randle*, 69 F.3d at 451.  Plaintiffs have met this burden, so their retaliation claim survives summary judgment.[7]

### F.  Claim V—Section 1983

Finally, plaintiffs claim that defendants deprived Mr. Robinson of due process in violation of the Fourteenth Amendment.  U.S. Const. amend. XIV § 1; ECF No. 11 at ¶¶143–50. They assert this claim under 42 U.S.C. § 1983.  Defendants argue that plaintiffs have not satisfied the requirements for municipal liability to attach, ECF No. 28 at 15, and that the claim against the individual defendants is barred by qualified immunity, *id.* at 9.

Holding a municipality liable under § 1983 requires plaintiff "identify a government's policy or custom that caused the injury" and show "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) and *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)) (internal quotations omitted).  A single decision by a municipal employee may form the basis of municipal liability when that decision "may fairly be said to represent official policy.*"  Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (quoting *Monell*, 436 U.S. at 694).  To overcome a defense of qualified immunity, plaintiffs must show (1) that a constitutional violation occurred;

---

[7] Plaintiffs would also survive summary judgment if they had to show some affirmative evidence showing a causal connection between Mr. Robinson's reporting discrimination and his firing.  As discussed above, Mr. Bell's skepticism, victim-blaming, and anger at Mr. Robinson's informal discrimination report, Mr. Jackson's accusation of slander, and the reprimand of Mr. Robinson the day after his formal discrimination report was resolved could support a finding that firing Mr. Robinson was done in retaliation for his reporting discrimination.

and (2) that the right was clearly established.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009);

*see also Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982)).  Both the municipal liability and qualified immunity claims require

plaintiffs show a constitutional injury.  *See Schneider*, 717 F.3d at 769; *Pearson*, 555 U.S. at

232.  They have not done so.

 Plaintiffs claim that defendants deprived Mr. Robinson of both pre-termination and post-

termination process to which he was constitutionally entitled.  Plaintiffs claim that Mr. Robinson

was entitled to "notice, an opportunity to be heard, and a . . . hearing" before he was fired.  ECF

No. 11 at ¶147.  Defendants respond first that Mr. Robinson did not have a constitutional right to

pre-deprivation process and, alternatively, that the pre-deprivation process afforded Mr.

Robinson was sufficient.

 I agree that Mr. Robinson was afforded the pre-termination process he was due.  Mr.

Robinson had a property interest in his employment because he enjoyed for-cause job protections

under the CBA.  *See Lentsch v. Marshall*, 741 F.2d 301, 305 (10th Cir. 1984) ("Generally, a

government employee who may be dismissed only 'for cause' has a protected property interest,

whereas one who may be dismissed 'at will' does not.").  The Due Process Clause thus applied

to his termination.  *See West v. Grand Cnty.*, 967 F.2d 362, 366 (10th Cir. 1992) ("This Circuit

has made it clear that when a person's employment can be terminated only for specified reasons,

his or her expectation of continued employment is sufficient to invoke the protections of the

Fourteenth Amendment.").

 The Tenth Circuit's standards for pre-termination process "are not very stringent."  *Hulen

v. Yates*, 322 F.3d 1229, 1248 (10th Cir. 2003) (quoting *West v. Grand Cnty.*, 967 F.2d 362, 368

(10th Cir.1992)).  They require only notice of an impending termination decision and the

opportunity to raise objections. *West*, 967 F.2d at 367 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). "A brief face-to-face meeting with a supervisor" satisfies due process. *Id.* at 368.

Mr. Robinson received sufficient pre-termination process. In *West v. Grand County*, the Tenth Circuit sustained dismissal of a § 1983 claim brought by a former employee claiming she was improperly fired after a pretextual reduction in force. 967 F.2d at 364–65. The court found that she had received sufficient pre-termination process because "she was aware that her job likely was not going to be retained" and "had the opportunity to discuss her rights as a permanent employee" with supervisors. *Id.* at 364. Here, Mr. Robinson applied and interviewed for a new position before his old position was terminated. The interview process notified him that his job was not going to be retained and afforded him the opportunity to make the case for his continued employment. I find this sufficient to satisfy pre-termination due process.

Plaintiffs also claim that Mr. Robinson was not afforded sufficient post-termination process. They claim that defendants Bell and Jackson violated Mr. Robinson's right to a neutral decisionmaker when they reviewed Mr. Robinson's grievance claims. ECF No. 11 at ¶ 148. Plaintiffs further allege that the District and the Board of Education deprived Mr. Robinson of due process when it permitted the District's attorney to sit in on the executive session in which they considered and rejected the arbitrator's recommendation. *See id.* at ¶149.

I disagree. First, Mr. Robinson waived his claim that Mr. Bell and Mr. Jackson were impartial decisionmakers by failing to object during the grievance process. *See West*, 967 F.2d at 370 (holding that an employee waived her claim "that the Commissioners at the hearing were biased because they were the same decisionmakers who approved her termination" when she "expressed . . . misgivings" but "did not adequately object to the post-termination forum at the

time of the post-termination hearing").  In any case, Mr. Bell and Mr. Jackson were not final

decisionmakers—Mr. Robinson could and did appeal their decisions.

The Board of Education's decision to permit their attorney to join the executive session

also did not deprive Mr. Robinson of his constitutional rights.  In *Weissman v. Board of*

*Education of Jefferson County*, 547 P.2d 1267 (1976), the en banc Colorado Supreme Court

found that a plaintiff's due process rights were not violated when the Jefferson County Board of

Education allowed their attorney—who had participated in a previous hearing "in an adversary

role akin to a prosecutor"—to sit in on the Board's private deliberations about the plaintiff's

employment.  *Id.* at 1276.  The *Weissman* court agreed that the attorney's retiring with the Board

was "imprudent[]" and might cause the "appearance of impropriety or unfairness."  *Id.*  But it

declined to reverse the lower court's dismissal because of "the fact that [the attorney] cast no

vote, and the apparent absence of any substantial prejudice to appellant."  *Id.*  I find *Weissman*

instructive.  Here, there is no allegation that the Board of Education's attorney cast a vote,

participated in deliberations, or substantially prejudiced Mr. Robinson.  The attorney's presence

was improper, but it did not deprive Mr. Robinson of his rights under the Due Process Clause.

## ORDER

Defendants' motion for summary judgment (ECF No. 28) is DENIED IN PART and

GRANTED IN PART.

DATED this 16th day of November, 2021.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

24